**MINNESOTA SCHOOL BOARDS ASSOCIATION INSURANCE TRUST, Plaintiff,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, A Mutual Company, a corporation, Defendant.**

**No. Civ. 3:96–1029DWF AJB.**

United States District Court, D. Minnesota.

March 1, 2001.

Stephen Knutson, John O'Donnell, Michelle Kenney, Knutson Flynn Deans & Olsen, Mendota Heights, MN, for plaintiff.

Mark Feinberg, Michael Cashman, Zelle Hofmann Voelbel, Mason & Gette, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge pursuant to cross motions for summary judgment. In the Complaint, Plaintiff alleges that Defendant breached an insurance contract between the parties. For the reasons set forth below, both motions are denied.

### Background

Plaintiff Minnesota School Boards Association Insurance Trust ("the Trust") provides insurance to school districts which are members of the Minnesota School Boards Association. The Trust provides three types of insurance: workers compensation, health, and property and casualty. This litigation involves the property and casualty fund which was established in 1986 to provide insurance coverage to member school districts, the Minnesota School Boards Association Insurance Trust Group Self–Insured Property and Casualty Plan ("the Plan").

Individual school districts joined the Plan on various dates, becoming "Plan Participants," but the first policies were issued in April of 1986. The Trust insured its Plan Participants for a one-year period from the date of their entry or renewal under the Plan.

The Trust established a program of reinsurance and excess insurance (the "Risk Protection Program") to cover the Trust's exposure for potential catastrophic losses under the primary policies it issued to Plan Participants. Kenneth Harrison ("Harrison"), an insurance broker for G & H, Inc. in Philadelphia, created and brokered the Trust's Risk Protection Program from the Plan's inception in 1986 until the Trust terminated him on April 1, 1994. Although individual Plan Participants had terms of coverage beginning and ending on various dates, the Risk Protection Program was organized to provide coverage for one-year terms beginning and ending on April 1 of each year.

For the April 1, 1993 to April 1, 1994 term,[1] the Trust's potential liability was

---

1. One of the critical issues presented to the Court is what exactly this "term" means. Defendant Employers Insurance of Wausau argues that the Risk Protection Program coverage for this term covers all losses occurring between April 1, 1993 and April 1, 1994. The

Trust, in contrast, contends that the 1993–1994 policy provides one year of coverage to each and every Plan Participant that joined or renewed during the April 1, 1993 to April 1, 1994 time period; thus, the 1993–1994 policy extends beyond April 1, 1994 for Plan Partici-

distributed among a number of companies. The Trust retained the first $250,000 of risk. Liability between $250,000 and $3,250,000 was covered on a $^{50}\!/\!_{50}$ basis by Munich American Reinsurance Company and American Reinsurance Company. Liability between $3,250,000 and $6,750,000 was covered by Generali Assicurazzioni. Any payments to Plan Participants in excess of $6,750,000 and up to $50,000,000 were subject to reimbursement by Defendant Employers Insurance of Wausau ("Wausau") pursuant to an excess insurance policy, the Wausau Excess Policy No. 2266–02–052314 ("the 1993–1994 Policy"). In point of fact, the policy period for "the 1993–1994 Policy" ran from April 1, 1993 to April 1, 1996, but the invoice/rating period was annual; the annual premium paid by the Trust to Wausau for this excess coverage was $275,000 for the period of April 1, 1993 through April 1, 1994.

In December of 1993 and in the ensuing months, the Trust engaged Towers Perrin, an insurance and reinsurance consultant, to take over Harrison's position. The Trust advised Harrison, by letter dated December 27, 1993, to issue provisional notices of cancellation, effective April 1, 1994, to all participants in the Trust's Risk Protection Program. Towers Perrin urged the Trust to convert its Risk Protection Program from a mixture of excess insurance and reinsurance to an exclusively reinsurance-based plan.[2] Upon agreeing to Towers Perrin's proposal in late January of 1994, the Trust directed Harrison to issue notices of cancellation, effective April 1, 1994, to all participants in the Risk Protection Program. By letter dated

February 2, 1994, Harrison complied and canceled the Wausau coverage effective April 1, 1994.

Towers Perrin drafted new terms and conditions for the Risk Protection Program, including the $6,750,000 to $50,000,000 layer covered by Wausau.[3] Towers Perrin provided the terms for this layer of coverage to both Travelers Insurance Company and Wausau; because Wausau was willing to underwrite the layer for a $250,000 annual premium—more than $50,000 less than the quote provided by Travelers—the Trust chose to have Wausau underwrite this layer of the Risk Protection Program. Wausau issued a policy, Policy No. 1565–00–096197, ("the 1994–1995 Policy") for the term from April 1, 1994 to April 1, 1995.[4]

On April 25, 1994, Burnsville High School, a division of Plan Participant Independent School District No. 191, suffered an arson fire. The Trust settled and paid the entire clam—$14,141,781.73—under the primary policy. The other participants of the Risk Protection Program, those with liability layers beneath Wausau, paid their full limits of liability to the Trust. The Trust contends that Wausau is responsible for $7,356,781.73, the amount of the claim over $6,750,000.

Wausau denied liability under either the 1993–1994 Policy or the 1994–1995 Policy. With respect to the 1993–1994 Policy, Wausau claims that the policy was unilaterally cancelled effective April 1, 1994, and so there is no coverage; the Trust argues that the 1993–1994 Policy, even after cancellation, provides run-off coverage to Plan

---

pants who joined or renewed on some date after April 1, 1993.

2. The Trust contends that the switch was solely to accommodate Towers Perrin, which was not licensed to broker excess insurance policies, while Wausau asserts that Towers Perrin urged the switch for economic reasons. The reason for the change in coverage type is inconsequential to the motions before the Court.

3. The Trust objects to Wausau's characterization of the 1994–1995 Risk Protection Program as "new." In point of fact, many of the terms, conditions, and participants remained the same. Again, however, this dispute is not relevant to the case at hand.

4. There is some question whether the policy was another excess loss policy or a reinsurance policy. Once again, that issue would not seem to be relevant to the matter before the Court.

Participants who joined or renewed on some date after April 1, 1993. With respect to the 1994–1995 Policy, Wausau contends that the policy is risk attaching so that coverage for Independent School District No. 191 did not commence until June 30, 1994 (when I.S.D. No. 191 renewed its participation in the Plan during the 1994–1995 Policy's term). The Trust argues that, to the extent that the parties disagreed about the nature of the 1993–1994 Policy and the negotiations on the 1994–1995 Policy were made with reference to the 1993–1994 Policy, there was no meeting of the minds with respect to the 1994–1995 Policy. Accordingly, there was no contract formed which supercedes the Binder entered into with respect to the 1994–1995 Policy term, and that Binder provided for loss-occurring coverage. Thus, to the extent that the 1993–1994 Policy did not provide coverage for the Burnsville fire, the Binder for the 1994–1995 Policy did provide coverage.

The matter is before the Court on cross motions for summary judgment.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957.

### 2. The 1993–1994 Policy

With respect to the 1993–1994 Policy, there are two points of contention between the parties. First, the Trust argues that its cancellation of the 1993–1994 Policy was merely provisional, that it did not intend to cancel the policy at all, and that the conduct of the parties demonstrates that neither side considered the policy to be genuinely "cancelled." The Trust's position on this issue is wholly unsupported by the facts in the record. The notice of February 2, 1994, over Harrison's signature, could not be more clear or unequivocal: the 1993–1994 Policy was cancelled effective April 1, 1994.

The second point of contention between the parties, however, is whether any run-off coverage existed after April 1, 1994. Wausau maintains that the 1993–1994 Policy and the other policies which preceded it were all loss-occurring; thus, the effect of cancellation was to terminate coverage for every loss which occurred after April 1, 1994. In contrast, the 1994–1995 Policy is clearly on its face a "risks-attaching" policy; thus, coverage under the 1994–1995 Policy for losses sustained by the Burnsville school district did not commence until June 30, 1994—the date on which the Burnsville school district renewed its membership in the Plan and, thus, risk

attached. Because of the change in the type of reinsurance/excess insurance coverage, from loss-occurring to risks-attaching, there was a gap in coverage for the Burnsville school district.

The Trust argues, in contrast, that all of the reinsurance and excess insurance policies written by Wausau, including the 1993–1994 Policy, were risks-attaching. As a result, the effect of the April 1, 1994, cancellation was to terminate coverage for any new risks which attached after April 1, 1994; for risks which attached prior to April 1, 1994, however, the 1993–1994 Policy provided run-off coverage until those risks expired. As a result, because the Burnsville school district renewed its participation in the Plan on June 30, 1993, for a one year term, one year of "risk" attached on June 30, 1993; thus the 1993–1994 Policy provides run-off coverage for losses incurred by the Burnsville school district until June 30, 1994.

On its face, the 1993–1994 Policy is for "Following Form Excess Insurance." The agreement states that "[t]he insurance afforded by this policy shall be subject to the same terms and conditions ... as the Primary Insurer, M.S.B.A. Insurance Trust, Policy Number 20–000000–00 ...." The parties agree that there is no Policy Number 20–000000–00 which was issued by the Trust to any of the Plan Participants. Thus, on its face, the 1993–1994 Policy is ambiguous as to which form it is following; whether the "terms and conditions" of the form which the 1993–1994 Policy was meant to follow have implications for the risks-attaching or losses-occurring nature of the 1993–1994 Policy is a question of fact which cannot be resolved on a motion for summary judgment. Moreover, while the Declarations page of the 1993–1994 Policy lists the policy period as running from April 1, 1993 to April 1, 1996, this notation is not inconsistent with a risks-attaching policy and the Declarations page does not specify that the policy is written on a losses-occurring basis. Again, the 1993–1994 Policy is simply not clear regarding the nature of the coverage being provided.

Given the ambiguity of the 1993–1994 Policy, the Court turns next to evidence extrinsic to the insurance contract itself. Again, the extrinsic evidence could support either the conclusion that the Policy was risks-attaching or the conclusion that the Policy was losses-occurring. There is evidence in the record that Harrison, who was involved in negotiating and drafting the 1993–1994 Policy on behalf of the Trust, understood the 1993–1994 Policy to be risks-attaching. Wausau's behavior following the cancellation date (specifically, failing to return any portion of the premiums paid) and following the Burnsville loss (specifically, making a partial payment on the Trust's indemnification claim) also suggests the possibility that the parties understood the 1993–1994 Policy to be risks-attaching. Finally, the internal notes of Towers Perrin, which Wausau introduces to demonstrate that the Trust's own representatives were uncertain about the existence of run-off coverage, further highlight the ambiguity of the 1993–1994 Policy coverage.

Ultimately, there are genuine issues of material fact as to the existence of run-off coverage from the 1993–1994 Policy which preclude summary judgment for either party on this matter.

**3. The 1994–1995 Policy**

As noted above, the Trust makes an alternative argument that, to the extent that the Trust misunderstood the nature of the 1993–1994 Policy, that misunderstanding precluded any meeting of the minds as to the formation of the 1994–1995 Policy. As a result, the Trust argues, the Binder preceding the 1994–1995 Policy remained in effect rather than the 1994–1995 Policy itself. The Trust further argues that the Binder was losses-occurring, in contrast to the clearly stated risks-attaching basis of the 1994–1995 Policy. Thus, following this rather tortured logic, if the 1993–1994 Policy was losses-occurring then the Burnsville

fire should be covered by the similarly losses-occurring Binder preceding the clearly risks-attaching 1994–1995 Policy.

The Court finds that, as a matter of law, this particular argument must fail. Both parties agreed to a risks-attaching policy for the 1994–1995 term, and that agreement is made clearly manifest in the terms of the policy. At most, there was some confusion over the nature of a policy which had been unequivocally cancelled. While the Trust's desire to enter into a risks-attaching reinsurance agreement for the 1994–1995 Policy may be relevant to the Trust's understanding of the coverage under the 1993–1994 Policy, the confusion does not cast any doubt on the validity of the 1994–1995 Policy itself.

On its face, the 1994–1995 Policy is risks-attaching. Accordingly, coverage for the Burnsville school district did not commence under the 1994–1995 Policy until June of 1994, when the Burnsville school district renewed its participation in the Plan. If there is coverage for the April 25, 1994, Burnsville school fire, it is run-off coverage from the 1993–1994 Policy. While the Court has determined that there are genuine issues of material fact as to coverage under the 1993–1994 Policy, no such questions of fact exist as to the 1994–1995 Policy. Thus, although the Court is denying summary judgment as to the various claims in the Complaint, the Court finds that the Trust should be precluded from advancing any theories of recovery on those claims predicated on the 1994–1995 Policy.

For the reasons stated, IT IS HEREBY ORDERED:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 159) is **DENIED**; and

2. Defendant's Motion for Summary Judgment (Doc. No. 146) is **DENIED**.